21cr239 ECT

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No.

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | INFORMATION |
| v. | 18 U.S.C. § 1343<br>18 U.S.C. § 1349 |
| HARED NUR JIBRIL, | |
| Defendant. | |

RECEIVED
NOV 15 2021
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

THE ACTING UNITED STATES ATTORNEY CHARGES THAT:

## BACKGROUND

**The Food Stamp Program**

1. The United States Department of Agriculture ("USDA") is an agency of the United States.

2. The Food and Nutrition Service is an agency of the USDA that runs the federal Food Stamp Program. The Food Stamp Program is funded entirely by the USDA through the Food Nutrition Service.

3. The USDA established and implemented the Food Stamp Program to raise the level of nutrition of low-income households by helping qualifying families and individuals buy food at approved retail food stores.

4. The Food and Nutrition Service delegates certain administrative duties to appropriate state agencies. In Minnesota the Minnesota Department of Human


SCANNED
NOV 15 2021
U.S. DISTRICT COURT MPLS

Services determines food stamp eligibility and administers the distribution and redemption of food stamp benefits.

5. As of October 1, 2008, the official name of the Food Stamp Program changed to the Supplemental Nutrition Assistance Program (SNAP), but some of the forms and regulations still refer to the Food Stamp Program.

6. SNAP recipients are issued Electronic Benefit Transfer (EBT) cards that can be used at participating retailers. EBT cards are like debit cards, and in the case of SNAP, the EBT card is credited monthly with the recipient's allocated benefit amount. The recipients can redeem benefits at participating authorized retailers.

7. SNAP recipients may exchange their benefits only for eligible food items at the time of purchase of the eligible food items, and only at stores that are authorized by the USDA to accept SNAP benefits. According to regulations issued by the Secretary of Agriculture, authorized stores are prohibited from accepting SNAP benefits in exchange for items such as alcoholic beverages, tobacco, hot foods, cell phone minutes, and non-food items. These regulations also prohibit the redemption of SNAP benefits for cash, to pay down a credit account at a store, or to pay for eligible food items in advance of receiving the food.

8. SNAP benefits are redeemed like a debit card transaction, either by manually entering the account information or by swiping the EBT card through a Point of Sale (POS) device. The SNAP recipient then enters a personal identification number (PIN) on the machine's external PIN pad to complete the transaction. Once the SNAP recipient enters the PIN, the POS device communicates electronically with

FIS, a USDA administrator, to confirm availability of funds. FIS approves or rejects the transaction. Whether a transaction is approved or denied, the POS device records the EBT card account number, the date and time of the transaction, and the amount debited or attempted to be debited from the SNAP recipient's EBT card. When using EBT in a lawful manner, each transaction is for the exact dollar amount of the SNAP-eligible food items; the retailer does not provide the recipient with change.

9. To become eligible to participate in SNAP, retailers in Minnesota are required to complete, sign, and submit a Food Stamp Program Application for Stores, form FNS 252. This application includes a certification from the applicant stating that he or she has read and reviewed the program rules and regulations. If the Food and Nutrition Service authorizes the retailer, it sends an authorization packet to the retailer, which also discusses the requirements of SNAP. The forms in this packet tell the retailer that the only allowable use of EBT food stamp benefits is to purchase food.

10. Retailers approved by the USDA to participate in SNAP are issued a food stamp authorization number and are provided with a POS device, which debits SNAP recipients' accounts for the cash value of the items purchased. USDA then reimburses the retailer for the redemptions via an electronic transfer into a bank account designated by the retailer.

**The WIC Program**

11. The Food and Nutrition Service also administers the Special Supplemental Nutrition Assistance Program for Women, Infants and Children

("WIC"). WIC is funded by the USDA through the Food Nutrition Service and through a rebate from an infant formula manufacturer.

12. The USDA established and implemented WIC to provide special supplemental foods, health screening, and nutrition education to pregnant, postpartum, and breastfeeding women, infants, and children from families with inadequate income. The foods provided by the WIC Program contain specific nutrients intended to treat and prevent nutritional deficiencies and related health conditions.

13. In running WIC, the Food and Nutrition Service delegates certain administrative duties to state agencies. In Minnesota, the Minnesota Department of Health ("MDH") administers and monitors the WIC program.

14. In Minnesota, WIC foods are provided through use of food benefits that the participants or their authorized proxies can redeem for authorized foods at retail grocery stores and pharmacies (vendors) authorized to accept them. Between October 2018 and October 2019, the Minnesota WIC Program transitioned its food benefits from paper vouchers to EBT cards.

15. Food benefits in the form of WIC EBT cards have unique serial numbers and have magnetic stripes that allow an online connection to the WIC Program's contract EBT processor and attach to a particular WIC household's aggregate food benefits.

16. To conduct a WIC EBT transaction, stores use either a "stand beside device" supplied by WIC's contract EBT processor, or a sophisticated "integrated"

4

POS system certified by the WIC EBT processor. Hormud Meat and Grocery used both technologies for its WIC transactions. Both types of equipment are configured with the vendor's unique WIC identification number, which attaches to the electronic record of each WIC transaction. During each WIC transaction, the customer will swipe their WIC EBT card and enter their PIN. The cashier will scan the UPC code of each non-produce WIC food item, and, depending on technology type, either key-enter the price of each individual WIC produce item or scan the UPC or PLU of each WIC produce item. When the transaction is finalized, it is electronically routed to WIC EBT processor, which validates the transaction, deducts from the card the foods provided, and routes payment electronically to the vendor's bank account.

17. Regulations governing the WIC Program prohibit the redemption of WIC benefits for cash or non-food items, to finance a credit account at a store, or to pay for eligible food items in advance of receiving the food.

18. To become eligible to participate in WIC, retailers in Minnesota are required to complete, sign, and submit a WIC application form. If the store meets program requirements, store personnel must receive training and the owner must execute a Retail Food Vendor Agreement. The Retail Food Vendor Agreement is a contract between the WIC Program and the vendor that, among other things, describes the terms of the vendor's participation in the program, including that the vendor must comply with all applicable federal and state regulations and outlines the penalties for failure to comply with program requirements.

**Unemployment Insurance**

19.     The Social Security Act of 1935 initiated the federal and state unemployment insurance (UI) system. The system provides benefits to individuals who are unemployed for reasons beyond their control. The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment. UI is a joint state-federal program pursuant to which eligible people who had lost employment earnings could apply for cash benefits. In the State of Minnesota, the UI system is administered by the Department of Employment and Economic Development ("DEED").

20.     As a result of the COVID-19 pandemic, the federal government provided significant supplemental benefits to the states. Beginning in March 2020 and continuing through September 6, 2021, the Families First Coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, and the American Rescue Plan Act of 2021 (ARPA) have created federal programs that allowed for the significant outlay of federal funds flowing to the states to offset the historical need for unemployment benefits by the American workforce, including, to the State of Minnesota. Together, these laws provided additional flexibility for state Unemployment Insurance ("UI") agencies and additional funding to respond to the COVID-19 pandemic.

21.     During the summer of 2020, among other times, Minnesota was providing UI cash benefits to assist individuals affected by the pandemic.

22. To receive UI benefits, applicants had to complete certifications to DEED in which they attested under penalty of perjury that they had lost employment due to the pandemic. If authorized for benefits, recipients received weekly cash payments on prepaid debit cards or directly deposited into their bank accounts.

23. During the COVID-19 pandemic, funds for Minnesota's UI benefits were electronically distributed from the United States Department of Treasury to DEED and ultimately to the recipients.

**The Defendant and The Store**

24. At all times relevant to this Information, JIBRIL, was the owner of Hormud Meat & Grocery Market ("Hormud Market"), a USDA-designated "small grocery store" located at 3360 W. Division St., St. Cloud, MN 56301. JIBRIL also worked as a store cashier at Hormud Market.

25. Hormud Market has been authorized to participate in the USDA SNAP since approximately July 2009 and it was reauthorized to participate in January 2018. On January 17, 2018, JIBRIL signed a certification to USDA promising among other things that he would "accept responsibility on behalf of the firm for violations of the Supplemental Nutrition Assistance Program regulations, including those committed by any of the firm's employees, paid or unpaid, new full-time or part-time. These include violations such as, but not limited to: Trading cash for Supplemental Nutrition Assistance Program benefits (i.e. trafficking); Accepting Supplemental Nutrition Assistance Program benefits as payment for ineligible items; Accepting Supplemental Nutrition Assistance Program benefits as payment on credit accounts or loans;

Knowingly accepting Supplemental Nutrition Assistance Program benefits from people not authorized to use them." Signing the certification JIBRIL attested, "I have read, understand and agree with the conditions of participation…and agree to comply with all statutory and regulatory requirements associated with participation in the Supplemental Nutrition Assistance Program." The certification informs the applicant that, in addition to any other sanctions described in the agreement, the vendor is subject to prosecution under applicable federal, state, or local laws for violation of SNAP rules and regulations.

26.   Hormud remained authorized by FNS to accept SNAP benefits.

27.   At all times relevant to this Information, a retail food Vendor Agreement signed by JIBRIL was in effect between the Minnesota WIC Program and Hormud. For example, on February 14, 2017, and February 17, 2020, JIBRIL signed WIC Vendor Agreements that stated in part, "The Vendor shall not provide, in exchange for a WIC food benefit, any store credit (including rain checks), cash, non-food items, or food items other than WIC-allowed foods on the WIC food benefit."

28.   At all relevant times, JIBRIL worked at his store and received money from the USDA for SNAP and WIC transactions.

29.   Although he was employed during this time, including throughout the spring and summer of 2020, JIBRIL applied to DEED for UI benefits, falsely stating under oath that he was unemployed due to the COVID-19 pandemic. Thereafter, JIBRIL submitted weekly certifications to DEED, falsely stating under oath that he did not work or receive any earnings or income. Relying on these false representations,

DEED paid JIBRIL $32,724 in UI benefits, including $2,048 withheld for taxes, between May 2020 and September 2020.

## COUNT 1
### (Conspiracy To Commit Wire Fraud)

30.     Paragraphs 1-29 are incorporated herein. From at least in or about February 2018 through in or about August 2021, in the State and District of Minnesota, the defendant,

**HARED NUR JIBRIL,**

did knowingly conspire, combine, and agree with other persons known and unknown to the Acting United States Attorney to devise a scheme and artifice to defraud the USDA and to obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signals and sounds.

30.     The purpose of the conspiracy was to fraudulently obtain money from the USDA by exchanging SNAP and WIC benefits for ineligible items and cash.

31.     As part of the scheme, JIBRIL and other cashiers at his store allowed customers to use their SNAP and/or WIC benefits to purchase ineligible items such as cash, phone minutes, body care products, and food from JIBRIL's restaurant. JIBRIL and his employees would fraudulently ring up eligible items or "general foods" while giving the customer the cash or other ineligible items instead of valid SNAP or

9

U.S. v. Hared Nur Jibril

WIC foods. They would also permit customers to use SNAP benefits to pay down credit accounts. Hormud was reimbursed by the USDA for the full amount of the fraudulent SNAP and WIC transactions.

32. All in violation of Title 18, United States Code, Sections 1343 and 1349.

## COUNT 2
## (Wire Fraud)

33. Paragraphs 1-29 are incorporated herein.

34. Beginning in or around March 2020, and continuing until at least in or around August 2020, in the State and District of Minnesota, and elsewhere, the defendant,

**HARED NUR JIBRIL,**

did knowingly and unlawfully devise and participate in a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions, namely, unemployment insurance benefit fraud as described above; and for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds, including, but not limited to, the wire described below:

U.S. v. Hared Nur Jibril

| Date of receipt of wire (on or about) | Amount | Description of interstate wire |
|---|---|---|
| May 5, 2020 | $2,400 | Wire from U.S. Treasury in Washington D.C. to the Minnesota Department of Employment and Economic Development in Minnesota, ultimately deposited into JIBRIL's TCF Bank account #xxx-xxx-8276 |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATIONS

35.  Upon conviction of Count 1 of this Information, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including the $8,860.68 seized on September 14, 2021, from Wells Fargo Bank account xxx-xxx-0759 in the name of HORMUD MEAT AND GROCERY MARKET INC.

36.  Upon conviction of Count 2 of this Information, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense.

37.  If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as

provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Dated: November 12, 2021

CHARLES J. KOVATS, JR.
Acting United States Attorney

*s/ Sarah E. Hudleston*
BY:   SARAH E. HUDLESTON
Assistant U.S. Attorney
Attorney ID No. 0351489